UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| DMC, by NEXT FRIEND BILL CANTRELL, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 3:05-cv-124-RLY-WGH |
| JO ANNE B. BARNHART, Commissioner of the Social Security Administration, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM DECISION AND ORDER**

**I. Statement of the Case**

Plaintiff DMC, a minor, seeks judicial review of a final decision of the agency, which found her no longer disabled and, therefore, no longer entitled to Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). 42 U.S.C. § 1382c; 20 C.F.R. § 416.994a. The court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

Plaintiff applied for SSI on June 22, 1998, alleging disability since August 23, 1993. (R. 73). Plaintiff was eventually granted SSI benefits. However, on September 2, 2003, after performing a continuing disability review, the Agency determined that plaintiff's condition had medically improved and that she no longer qualified for SSI benefits. (R. 25). Plaintiff filed a request for reconsideration on September 22, 2003, (R. 35), and appeared with her guardian, Bill Cantrell, at a hearing before Administrative

Law Judge ("ALJ") Marsha Stroup on August 24, 2004. (R. 488-519). Plaintiff was represented at the hearing by her attorney, Katherine Rybak. (R. 488). The ALJ issued a decision on December 9, 2004, finding that plaintiff was no longer eligible for SSI. (R. 20). Plaintiff filed a request for review with the Appeals Council, (R. 9), and the ALJ's decision became the agency's final decision when the Appeals Council denied plaintiff's request for review on May 5, 2005. (R. 5-8). 20 C.F.R. §§ 404.955(a), 404.981. Plaintiff then filed a complaint on July 8, 2005, seeking judicial review of the ALJ's decision.

## II.  Standard of Review

An ALJ's findings are conclusive if they are supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); see also *Perkins v. Chater*, 107 F. 3d 1290, 1296 (7th Cir. 1997). This standard of review recognizes that it is the commissioner's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide questions of credibility. *Richardson*, 402 U.S. at 399-400. Accordingly, this court may not re-evaluate the facts, weigh the evidence anew or substitute its judgment for that of the commissioner. *See Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, even if reasonable minds could disagree about whether or not an individual was "disabled," the court must still affirm the ALJ's decision denying benefits. *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).

### III.  Standard for Disability of a Child

In order to qualify for benefits under the Act, a child under age eighteen (18) must establish that she suffers from a "disability" as defined by the Act.  For children, "disability" is defined as a "medically determinable physical or mental impairment, which results in marked and severe functional limitations."  42 U.S.C. § 1382c(a)(3).  The Social Security regulations set out a sequential three-step test that the ALJ is to perform in order to determine whether a child is disabled.  *See* 20 C.F.R. § 416.924.  The ALJ must consider whether the claimant: (1) is presently employed; (2) has a severe impairment or combination of impairments; and (3) has an impairment that meets, medically equals or functionally equals the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  An impairment will be found to have limitations that "functionally equal the listings" if it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain as explained in 20 C.F.R. § 416.926a.

### IV.  The ALJ's Decision

ALJ Stroup, concluded that plaintiff has never engaged in substantial gainful activity.  (R. 19).  The ALJ continued by finding that plaintiff originally was found to be disabled on October 13, 1998, because she met Listing 112.11, thereby making October 13, 1998, the comparison point date. (R. 19).  The ALJ concluded that plaintiff's impairment had experienced medical improvement as it no longer meets Listing 112.11 or any other listing in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 19).  However, the ALJ concluded that plaintiff still suffered from three impairments, a learning disability,

ADHD, and depression, all of which are severe impairments. (R. 19). But, the ALJ determined that none of these impairments met, medically equaled, or functionally equaled the criteria of any of the listings because plaintiff's impairments did not result in more than one "marked" functional limitation. (R. 19). The ALJ, therefore, concluded that plaintiff was no longer under a disability as defined by the Act. (R. 19).

## V. Discussion

Plaintiff argues that the ALJ erred in finding that she only suffered from "marked" limitations in one domain of functioning. (Brief in Support of Petition for Judicial Review at 5). Specifically, plaintiff argues that ALJ Stroup should have determined that plaintiff suffered from marked limitations in the domain of acquiring and using information. (*Id*.).[1] After a thorough review of the administrative record, the court concludes that the Social Security Administration's ("SSA") decision is not supported by substantial evidence.

A.  The Evidence as it Relates to Plaintiff's Limitations in the Domain of Acquiring and Using Information

The parties agree that the only point of contention between them is the ALJ's determination that plaintiff does not have a marked limitation in the domain of acquiring and using information. Hence, the court will limit its analysis to only medical evidence and other evidence concerning this limited issue.

Results dated February 15, 2001, from a Multidisciplinary Educational Evaluation

---

[1] Plaintiff complains that the ALJ failed to consider her standardized test scores in making a determination about her abilities in that domain.

Team Report ("MEETR") conducted by the Evansville-Vanderburgh School Corporation indicate significant problems. (R. 403-408). Specifically, Wechsler Individual Achievement Test ('WIAT") results indicated that plaintiff scored in the third percentile with standard scores of 72 each in basic reading and spelling, in the fourth percentile with a standard score of 73 in reading comprehension, and in the sixth percentile with a standard score of 77 in written expression. (R. 405). The WIAT carries a mean score of 100 with a standard deviation of 15, meaning that plaintiff scored nearly two standard deviations below the norm in all four of these areas. An additional test, the Child Behavior Checklist (Achenbach), revealed that plaintiff was more than two standard deviations above the norm with social problems (with a T-score of 78) and thought problems (with a T-score of 70). (R. 406). Also relevant to plaintiff's ability to acquire and use information was the MEETR's assessment that plaintiff "is functioning in the low range intellectually . . . with academic skills severely discrepant in the areas of reading and spelling." (R. 407).

A Report of Psychiatric Status performed by plaintiff's therapist, Andrea Adams, reported that Adams had observed plaintiff from March 21, 2002 to May 22, 2003. (R. 429-437). Adams indicated that plaintiff suffered from ADHD, Adjustment Disorder with mixed emotional features, learning disabilities, separation from her mother and sister, and peer problems. (R. 429). Plaintiff's current GAF score was 55.[2] (R. 429). In

---

[2]The Global Assessment of Functioning scale is used to rate the general functioning of children under eighteen. Children's Global Assessment Scale, Wikipedia *at* http://en.wikipedia.org/wiki/Children%E2%80%99s_Global_Assessment_Scale. A score of 51-60 is characterized

the area of communication, Adams reported that plaintiff talked very quickly, displayed slightly slurred speech, and often used words incorrectly, but that 100% of plaintiff's words were understandable. (R. 432). And, Adams explained that plaintiff has some problems with impulsivity and concentration in all settings and that plaintiff suffered from some peer conflicts at school. (R. 435). Finally, Adams stated that plaintiff's impairment had a probable long-term duration, but that she had displayed some improvement. (R. 436).

Responses to a teacher questionnaire completed on May 22, 2003, concerning the domain of acquiring and using information indicate that plaintiff has "a serious problem" in five out of ten categories including reading and comprehending written material, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, and recalling and applying previously learned material. ( R. 392).

In a letter dated June 4, 2003, Dr. Donald Atkinson indicated that he had been treating plaintiff since April 7, 2000. (R. 367). Dr. Atkinson's diagnosis of plaintiff was that she suffers from ADHD, Combined Type, and that she has difficulty staying on task without medication and that she has trouble focusing, concentrating, and staying on task both at home and at school. (R. 367). Dr. Atkinson also explained that plaintiff displayed judgment that was good for hypothetical situations and insight that was appropriate for

---

by "variable functioning with sporadic difficulties or symptoms in several but not all social areas; disturbance would be apparent to those who encounter the child in a dysfunctional setting or time but not to those who see the child in other settings." *Id*.

her age. (R. 367). Finally, Dr. Atkinson opined that plaintiff's intelligence was in at least the average range. (R. 367).

A July 18, 2003, the psychological evaluation conducted by Albert Fink, Ph.D., revealed that plaintiff suffered from Adjustment Disorder, low average intellectual functioning, and plaintiff's GAF score was 65.[3] (R. 355-357). Dr. Fink observed a Verbal IQ of 72, Performance IQ of 79, and a Full Scale IQ of 73 which was well below plaintiff's previous IQ scores from age five. (R. 356).

On February 24, 2004, Dr. Atkinson[4] filled out a questionnaire for SSI benefits. (R. 359-361). In the questionnaire, Dr. Atkinson indicated that plaintiff suffered from ADHD and possible post traumatic stress syndrome from alleged sexual abuse at age seven. (R. 359). Dr. Atkinson opined that plaintiff displayed marked limitations in the domains of 1) interacting and relating, and 2) attending and completing tasks, but not in

---

[3] A children's GAF score in the range from 61 to 70 is characterized by the following: some difficulty in a single area but generally functioning pretty well (eg., sporadic or isolated antisocial acts, such as occasionally playing hooky or petty theft; consistent minor difficulties with school work; mood changes of brief duration; fears and anxieties which do not lead to gross avoidance behavior; self-doubts); has some meaningful interpersonal relationships; most people who do not know the child well would not consider him/her deviant but those who do know him/her well might express concern.
Children's Global Assessment Scale, Wikipedia *at* http://en.wikipedia.org/wiki/Children%E2%80%99s_Global_Assessment_Scale.

[4] September 12, 2003, notes from Dr. Atkinson, who conducted psychiatric evaluations of plaintiff, indicate that plaintiff's "anxiety and depression causes her to have trouble with concentration and level of functioning overall." (R. 362). Dr. Atkinson continued by explaining that plaintiff "has difficulty staying on task and requires medication to do so," and that she has "difficulty with problem solving and is able to manage that on her own with extra effort." (R. 362).

the domain of acquiring and using information. (R. 360).[5] Dr Atkinson also noted that plaintiff suffered from another limitation in function, and he entitled it "emotional handicap." (R. 361).

Results from a November 25, 2003, MEETR conducted by the Evansville-Vanderburgh School Corporation indicate more difficulties with reading and writing. (R. 466-471). Specifically, Hammill Multiability Achievement Test ("HAMAT") results indicated that plaintiff scored in less than the first percentile with a standard score of 50 in reading, and in the first percentile with a standard score of 68 in writing. (R. 468). WIAT-II scores for the plaintiff were 66 in word reading and 69 in reading comprehension which were at the first and second percentiles respectively. (R. 468). Both of these tests carry a mean score of 100 with a standard deviation of 15, meaning that plaintiff scored beyond two standard deviations below the norm in three areas and well beyond three standard deviations below the norm on plaintiff's HAMAT score in reading. The MEETER concluded that plaintiff displayed written language and reading skills that were "severely discrepant." (R. 470).

A grade report generated on August 3, 2004, from the Spring Semester of plaintiff's eighth grade term (immediately preceding the ALJ's decision) indicates that plaintiff received a B grade in a *fifth* grade level spelling class and a B grade in a *sixth*

---

[5]The questionnaire stated that, within the domain of acquiring and using information, the very first criteria for determining if plaintiff's limitations were "marked" was "test scores that are two standard deviations or more below the norm." (R. 360).

grade level reading class. (R. 455).[6]

B.     The Domain of Acquiring and Using Information

The social security regulations state that an individual will be found to be disabled if they have a severe impairment that functionally equals the listings, and that an impairment functionally equals the listings when it results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. 416.926a. The ALJ found that plaintiff had a marked limitation in the domain of attending and completing tasks. (R. 17). Therefore, the only issue is whether plaintiff had a marked limitation in some other domain of functioning; in this case the relevant domain being the domain of acquiring and using information.

In determining whether an individual has a marked limitation in one of the domains of functioning, the SSA "will look at how appropriately, effectively, and independently [plaintiff] performs[s] [her] activities *compared to the performance of other children your age who do not have impairments*." 20 C.F.R. § 416.926a(b) (emphasis added). In order to determine if an individual has marked limitations, the SSA will examine all of the relevant information in the plaintiff's record including medical evidence. *Id*. § 416.926a(e)(1)(i). The regulations explain that:

> The medical evidence may include formal testing that provides information about your development or functioning in terms of percentiles, percentages of delay, or age or grade equivalents. Standard scores (e.g., percentiles) can be converted to standard deviations. When you have such scores, we will

---

[6]Plaintiff also received B grades in eighth grade level math and social studies classes, a D in fine arts and an F in physical education. (R. 455).

> consider them together with the information we have about your functioning to determine whether you have a "marked" or "extreme" limitation in a domain.

*Id.* § 416.926a(e)(1)(ii).

The SSA defines a marked limitation as one that interferes with an individual's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2)(i). Marked limitations are more than moderate and less than severe and would be equivalent to the type of testing expected on standardized testing with scores that are at least two standard deviations below the mean. *Id.* § 416.926a(e)(2)(ii). And, for individuals of any age, a marked limitation will be found when the individual has a valid score that is two standard deviations or more below the mean "on a comprehensive standardized test designed to measure ability or functioning in that domain," so long as that individual's day-to-day functioning in domain-related activities is consistent with that score. *Id.* § 416.926a(e)(2)(iii). In looking at test scores, the SSA has indicated that 1) it will not rely on test scores alone but will look at the overall picture, 2) test scores slightly above the required level of two standard deviations below the norm can be considered, and 3) there will be an explanation of why test scores were not used if they, in fact, are not relied upon. *Id.* § 416.926a(e)(4)(i)-(iii).

Finally, in examining the domain of acquiring and using information, the SSA determines how well an individual acquires or learns information and how well they are able to use that information. 20 C.F.R. § 416.926a(g). For adolescents in plaintiff's age group (from twelve to eighteen years old), the SSA asserts that:

> In middle and high school, you should continue to demonstrate what you have learned in academic assignments (e.g., composition, classroom discussion, and laboratory experiments). You should also be able to use what you have learned in daily living situations without assistance (e.g., going to the store, using the library, and using public transportation). You should be able to comprehend and express both simple and complex ideas, using increasingly complex language (vocabulary and grammar) in learning and daily living situations (e.g., to obtain and convey information and ideas). You should also learn to apply these skills in practical ways that will help you enter the workplace after you finish school (e.g., carrying out instructions, preparing a job application, or being interviewed by a potential employer).

§ 416.926a(g)(2)(iv).

C.      The ALJ'S Analysis of the Domain of Acquiring and Using Information

ALJ Stroup determined that plaintiff's limitations in the domain of acquiring and using information were not marked. In making this determination, the ALJ explained that plaintiff had a "borderline IQ and has difficulty staying on task but she does function well *for her ability level* in a learning disabled classroom setting." (R. 17 (emphasis added)). The ALJ concluded by explaining that plaintiff's "progress notes" indicate that she was doing well in school at the time, and that plaintiff, therefore, displayed limitations in the domain of acquiring and using information that were less than marked. (R. 17).

D.      The ALJ's Decision is Not Supported by Substantial Evidence

The ALJ is required to "build an accurate and logical bridge from the evidence to [the ALJ's] conclusion," so that the court can trace the path of the ALJ's reasoning. *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). In this instance, the court is unable to trace the path of ALJ Stroup's reasoning.

First, 20 C.F.R. § 416.926a(e)(4)(iii) clearly indicates that standardized test scores are an important part of the analysis of whether an individual suffers from marked limitations in a particular domain of functioning, and, if test scores are not used, the SSA is to explain why. In this instance, ALJ Stroup completely omitted any discussion of plaintiff's test scores and failed to indicate why. As discussed above, plaintiff's WIAT scores from 2001 in basic reading, spelling, and reading comprehension were all nearly two standard deviations below the mean. (R. 405). In November of 2003, only a year before ALJ Stroup's decision, plaintiff's HAMAT score for reading was significantly more than three standard deviations below the mean, and her writing score was over two standard deviations below the mean. (R. 468). Additionally, her word recognition and reading comprehension scores on the WIAT-II were beyond two standard deviations below the norm. (R. 468). Because reading and writing are crucial to the ability to acquire and use information, these are certainly the type of standardized comprehensive tests contemplated by the SSA to evaluate the domain of acquiring and using information. ALJ Stroup's failure to use these tests, or an explanation of why she made this decision, causes the court to be unable to trace the path of her reasoning.

Next, ALJ Stroup failed to take into consideration other relevant information. There is no evidence that the ALJ considered the teacher questionnaire from May 22, 2003, which indicated that plaintiff had "a serious problem" in five important areas relevant to acquiring and using information. And, the ALJ failed to take note of the observation by plaintiff's therapist, Andrea Adams, that indicated that plaintiff had

slightly slurred speech, often used words incorrectly, and spoke quickly.

Finally, the evidence the ALJ did rely on was misconstrued. Specifically, the court notes that ALJ Stroup found that plaintiff was doing well *for her ability level* and that she had recently received good grades. Yet, the regulations clearly indicate that an individual's abilities are to be measured against the normal individual without impairments, and not the average disabled individual.[7] If ALJ Stroup had really looked at plaintiff's grades, she would have found that they were misleading. Despite being at the end of her eighth grade academic year, all plaintiff could mange were Bs in a *fifth* grade level spelling class and a *sixth* grade level reading class, meaning she was three years behind in spelling and two years behind in reading. (R. 455). These grades actually appear to be consistent with MEETR's testing of plaintiff and their determination that she was "severely discrepant" in written language and reading comprehension. 20 C.F.R. § 416.926a(b).

The ALJ failed to consider plaintiff's standardized test scores which were more than two standard deviations below the mean, and in one instance even three standard deviations, and the court, therefore, can not the trace the path of her reasoning. The court concludes that these standardized test scores were actually consistent with many other pieces of evidence including 1) plaintiff's grades which indicate that she performed at well below her eighth grade level in areas relevant to the domain of acquiring and using

---

[7]This makes sense, as doctor's notes for a quadriplegic that indicated she was doing well (as compared to other quadriplegics) would have absolutely no bearing on whether or not she was disabled.

information and 2) a teacher's questionnaire which indicated that plaintiff had serious problems in five areas relevant to acquiring and using information. Because these standardized scores are consistent with plaintiff's day-to-day activities concerning her ability to acquire and use information, and because such scores are conclusive of "marked" limitations, the court concludes that plaintiff has succeeded in showing the two marked limitations necessary to functionally equal the listings. 20 C.F.R. § 416.926a(e)(2)(iii). Thus, plaintiff must be awarded SSI benefits.

## VI. Conclusion

The ALJ's decision is not supported by substantial evidence. The ALJ's decision is, therefore, **REVERSED** and plaintiff is awarded SSI benefits.

SO ORDERED.

Dated: July 20, 2006.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

Katherine J. Rybak
INDIANA LEGAL SERVICES, INC.
katherine.rybak@ilsi.net

Tracy L. Thread
INDIANA LEGAL SERVICES, INC.
tracy.thread@ilsi.net